United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICARDO A. ASTURIAS,<br><br>Petitioner,<br><br>v.<br><br>DEAN BORDERS, Warden,<br><br>Respondent. | Case No. 16-cv-02149-HSG (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Ricardo A. Asturias, challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse. For the reasons set forth below, the petition is denied.

## I. PROCEDURAL HISTORY

On October 23, 2012, a San Francisco County jury found petitioner guilty of continuous sexual abuse of a child and possession of child pornography. CT 502-09.[1] He was sentenced to 16 years, eight months in prison. RT 1252-53.

On May 7, 2015, the California Court of Appeal affirmed the judgment in an unpublished decision. Ex. 4. On August 12, 2015, the California Supreme Court denied review. Ex. 6. On December 14, 2015, the United States Supreme Court denied certiorari. *Asturias v. California*, 136 S. Ct. 697 (2015). Petitioner did not pursue state collateral review. The instant petition was filed on April 21, 2016.

## II. STATEMENT OF FACTS

---

[1] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated. References to "CT" and "RT" are to the Clerk's Transcript and Reporter's Transcript of the state proceedings.

The following background facts describing the crime and proceedings at trial are from the May 7, 2015 opinion of the California Court of Appeal.[2]

**Prosecution Case**

At the time of trial, "Jane Doe," who was born in 2004, was eight years old and in the third grade. She lived with her parents and her 13–year–old brother. Her mother, "Mrs. Doe," testified that appellant is the first cousin of Jane's father, and the children called him Uncle Al. Appellant was a constant presence in the lives of the Doe children; they often saw him on a weekly basis for weekend dinners at the Doe house, at family events, and on vacations. In addition to other vacation trips, appellant frequently traveled with the Doe family to Jane's uncle's vacation home in Sonoma County, which the family called "the ranch." When he visited the Doe home, appellant sometimes went upstairs with Jane to her room, to see her artwork or play a game. They would be there alone for five to twenty minutes. Jane's parents trusted appellant "completely." Jane felt like appellant was her uncle and she loved him very much. Appellant lived in an apartment about five blocks from the Doe home.

On October 1, 2010, after appellant had volunteered to babysit for Jane and her brother while their parents went out to dinner to celebrate their birthdays, Mrs. Doe mentioned his offer to her husband in front of Jane, who was sitting nearby. The next night, October 2, Jane, who was then six years old and in first grade, told her mother, "I want Uncle Al to visit, but I don't want him to babysit." When Mrs. Doe asked her why not, Jane asked, "Can I tell you a secret?" She then told Mrs. Doe that appellant "tickles my privates and I don't like it." Mrs. Doe was "completely stunned." She asked follow-up questions, and Jane told her it happened "[e]very time he goes to my room." Jane seemed hesitant and uncomfortable about "telling on" appellant. She also seemed shy and embarrassed. Mrs. Doe assured her that appellant would not be babysitting, and then dropped the subject until she had a chance to talk to her husband, who was working a 24–hour shift as a firefighter.

On October 4, 2010, Mrs. and Mr. Doe, who were still "in disbelief," asked Jane some questions about what appellant had done. Jane told them that appellant had touched her privates under her underwear and had put his finger inside her. She said the touching had happened in her room and also at the ranch, the vacation home in Sonoma. Mr. and Mrs. Doe waited a couple of days to report what Jane had told them because Mr. Doe was initially extremely upset and in a state of disbelief. They spoke first with an attorney friend, who explained that, if they reported the molestation, it did not mean Jane would be taken away from them. Mr. and Mrs. Doe then met with a social worker who helped them to make a report to Child Protective Services. In mid-October, Jane was interviewed at CASARC (Child and Adolescent Support Advocacy and Resource Center) at San Francisco General Hospital. Jane also had a medical examination.

---

[2] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), unless otherwise indicated in this order.

Mrs. Doe recalled that, on one occasion a short time before the disclosure, Jane did not want to hug appellant goodbye, which was unusual for her. Since the disclosure, they had talked about appellant on occasion. Jane had "wanted to make sure that [appellant] wouldn't be coming to the house, that she wouldn't see him." Mrs. Doe and Jane's therapist had also talked to Jane about the fact that she would need to testify in this case. Jane was nervous about this; she did not want to testify.

Jane Doe's father, "Mr. Doe," testified that appellant was like a brother to him. The Does and their extended family included appellant in all family gatherings and vacations, including visits to the ranch in Sonoma. Appellant also came to dinner at the Doe home almost weekly for many years. When he was at their house, appellant would often go upstairs with Jane to read a book or look at her artwork. When they were at the ranch, appellant and Jane also spent time alone together in the living room, watching movies on a laptop. Even when there were numerous children at the ranch, appellant paid particular attention to Jane.

On October 2, 2010, after his wife called him at work to let him know that Jane had told her about the molestation, Mr. Doe was "in a complete state of shock." The next afternoon, Jane told Mr. Doe that appellant was touching her in her private parts, under her clothes. She said it always happened when they were alone, either upstairs in the bedroom or at the ranch. Jane, who was six and in first grade at the time, said it had started when she was in pre-kindergarten. The following day, Mr. and Mrs. Doe spoke again with Jane, using a doll for Jane to show them where appellant had touched her. She pointed to the doll's vagina area and said that appellant had used his fingers to touch her there, under her underwear, and that he touched her "inside."

The Does then took Jane to a social worker, to make sure that the reporting of the molestation "was done in the most protective, calming way so that [Jane] was taken care of." The social worker called Child Protective Services and, at some point, the Does were interviewed by police officers. After they reported the molestation, Jane would periodically get scared and ask about what was going to happen and if she would have to see appellant again.

Before Jane's disclosure, Mr. Doe never had any reason to suspect that appellant was molesting her. At some point after the disclosure, Mr. Doe's cousin Tony told him that appellant had emailed him photographs of little girls, and Tony had told him to stop. Mr. Doe also remembered that a week or two before the disclosure, appellant had been at the Doe house for dinner and had spent time upstairs with Jane. When he left, Jane refused to hug him goodbye, which she had never done before.

Eight-year-old Jane Doe testified that appellant made her both happy and sad when she was in pre-kindergarten and kindergarten, and made her feel bad when she was in first grade. They would have "tickle fights" in Jane's room, and would tickle each other. Appellant tickled her in good spots, like her stomach, armpit, and knee. But he also tickled her in bad spots, like her foot and her vagina or private parts. Appellant would be kneeling and she would be lying on the bed when he tickled her. When he tickled her private parts, he did it both over and under her clothes. When he went under her clothes, he sometimes tickled her over and sometimes under her underwear. He used one finger to tickle Jane under her underwear, on the outside of her private parts. It hurt when he tickled her there.

3

When Jane was in pre-kindergarten, appellant touched her private parts under her underwear more than five and less than ten times, over her underwear but under her clothes more than five and less than ten times, and over her clothes more than five and less than ten times. When she was in kindergarten, it also happened more than five and less than ten times each under her underwear, over her underwear, and over her clothes. She did not remember it happening when she was in first grade. Appellant told Jane that his tickling her vagina was " 'a secret and you can't tell.' " Jane was afraid to tell him she did not like him touching her private parts.

While Jane was in pre-kindergarten, in addition to the touching in her bedroom, appellant touched her private parts over her clothes about five times while they were sitting on the couch at the ranch in Sonoma, watching a movie. This made Jane feel bad. The only other time appellant tried to touch Jane's private parts besides at her house or the ranch was one time at a Special Friends Day at her preschool. She was sitting on his lap and his hand was on her thigh, moving closer to her private parts. She tried to push his hand away because there were a lot of other people there and she did not like it when he did that.

Jane remembered telling her parents that appellant was touching her private parts. She did not want him to babysit because she was afraid he would touch her private parts. The last time he was at her house, before she told her parents, appellant had touched her private parts over her clothes.

Isabel K. is appellant's adult daughter. She grew up in El Salvador and had moved to the United States in 1992. Isabel, who was born in 1970, testified that she had not had a relationship with appellant for over 20 years. Isabel has an older sister, Victoria A., who was born in 1967, and an older brother, Diego, who was born in 1969. She also has a stepbrother, Sebastian, who was appellant's son from a subsequent marriage; he was born in 1977 or 1978. Appellant and Isabel's mother divorced when Isabel was five years old, in about 1975. She and her siblings continued to visit appellant after the divorce, usually on the weekends.

Isabel learned about appellant's criminal case from Sebastian. She did not know the Doe family, but she contacted Jane Doe's father and told him she was willing to testify in the case. She then contacted the district attorney's office. She reached out to Mr. Doe and the district attorney's office because she "believed that this has gone long—too long [sic ] and it needs to stop."

Appellant began sexually abusing Isabel after her parents' divorce, when she was between the ages of six and eight. During his Saturday visits, he would take her and her siblings to a swim club. Her first memory of the abuse was from one day when he was sitting in a chair at the club, and he grabbed her and made her sit on his lap. He held her in place and "was kind of moving me back and forth on his privates." Appellant was wearing a Speedo and Isabel was in a swimsuit. He had an erection.

Another time, Isabel was alone with appellant at a coffee farm he owned. It was very hot outside and appellant said they should swim naked in the river. In the river, he pulled her toward him and touched her vulva with his erect penis, though his penis never penetrated her vagina. While touching her, he looked at her with a "smirk," as "if it was the most

4

natural thing in the world." After these incidents, Isabel continued to spend time with appellant because she was a little girl and, even though she did not like what he was doing, he was her father and she loved him.

On another occasion, when appellant was living at his aunt's house while she was away, he put Isabel in a walk-in closet that contained a tripod and video camera. Her brother came into the closet and said, "Huh, would you believe my dad wants me to fuck you?" They laughed and then just sat there until appellant let them out. Another day, Isabel was with appellant at his aunt's house. They were lying on his aunt's bed and appellant, who was fully dressed, was rubbing her leg. He then started to touch her vulva, on top of her underwear. She said "No" twice and pushed him away. He slapped her on the leg and said, "You're acting just like your sister Victoria." Isabel, who could hear her brothers playing in the shower in a nearby bathroom, said she wanted to go shower with her brothers. Appellant made the boys get out of the shower, and he got in with Isabel. After her brothers left the bathroom, appellant soaped up his hand and started touching her vulva to the point that it hurt. He then said it was her turn to wash him, and handed her the soap. She did not recall whether she did what he asked. That night, appellant said the children had to take a pill so they would not get dengue when they visited the coffee farm the next day. They took the pills and Isabel recalled waking up in the middle of the night completely naked. She was in bed with appellant and her two brothers.

At some point, Isabel's sister Victoria asked if their father touched her in places she did not like. When Isabel said yes, Victoria took her and her brother to tell their mother what had been happening. Isabel saw appellant one more time after that, in approximately 1978, when he was about to move to the United States and he stopped by to say goodbye to Isabel and her siblings. She did not see him again after that until she came to court to testify in the present case. She was testifying "[b]ecause he needs to be stopped."

Victoria, appellant's other adult daughter, testified that she had lived all her life in El Salvador, and had not seen appellant since he left El Salvador in approximately 1980. Appellant had called her two or three times since 1980; the last time was in 2000. He also sent her an email every year on her birthday, but she never responded. Victoria, who was born in 1967, was the oldest of her siblings. She had a brother, Diego; a sister, Isabel; and a half brother, Sebastian. Victoria had learned about the criminal case against appellant from Sebastian.

Appellant began sexually abusing Victoria when she was four or five years old. The abuse stopped when she was about 12 or 13, after she told her mother about it. Before her parents divorced, in 1976 or 1977, appellant would take her into his bedroom when no one else was around, take off her clothes, and touch her vagina and masturbate her. Appellant would also be naked and would have an erection, and would fondle her with his finger and his penis. This occurred many times throughout the years. He always touched her in basically the same way, masturbating her. He also caressed her breasts.

After Victoria's parents divorced, when she was about nine, appellant abused her at other locations, such as at a coffee farm he owned. He would take the children there for the weekends. He would have them take off their clothes and swim in the pond. She recalled appellant fondling her vagina with his hand while sitting under a tree at the farm. After the divorce, appellant lived in a small house, where he molested Victoria many times in his

5

bedroom. Later, appellant remarried and moved with his wife to an apartment. He continued to abuse Victoria there, fondling her vagina after getting her away from her brother and sister. Appellant also took Polaroid photographs of Victoria when she was naked. He told her to pose on the bed by lying on her belly and putting her butt up or lying on her back with her legs open. She was between eight and ten years old when he took the pictures.

The abuse never occurred around any adults or in front of Victoria's siblings. At some point, Victoria started telling appellant that she did not like what he was doing and that she wanted him to stop. In response, he told her that he loved her and the sexual acts were a way of demonstrating that love. He once showed her a book to try to prove that it was normal for an adult to demonstrate his love for a child in that way.

When Victoria was 11 or 12 years old, she asked her sister and brother whether appellant had ever touched their private parts. After they both told her he had done so, Victoria took them to her mother and told her that appellant had been molesting them and that they did not want to see him anymore. As a result, they stopped visiting appellant. Victoria did not tell her mother about the abuse sooner because she was scared. Once, when she had told appellant that she was going to tell her mother, he said that nobody would believe her, which intimidated her. Victoria was testifying because she "wanted to help to put a stop to what he has been doing all throughout his life."

Albert "Tony" B. testified that both appellant and Mr. Doe are his first cousins. He knew appellant as a child in El Salvador and they reconnected in the United States when Tony was an adult. They became close, talked on the phone regularly, emailed each other, and saw each other at family functions.

In approximately 2005, appellant occasionally sent Tony emails that had an attachment containing one or more candid photographs of a pre-pubescent girl who was naked. Appellant sent such emails five or six times, with photographs of a different girl attached to each email. Initially, Tony deleted the emails after opening them. He was concerned that the emails contained child pornography, but did not contact the authorities because he loved appellant, who was family. Tony believed appellant had a penchant for little girls. Sometime after 2001, he had talked to appellant about sexual interest in children being wrong, and appellant had responded that this country has puritanical views about children. Appellant said that in other countries it is "perfectly legal" to be with a young girl. Appellant once told Tony that he had many firewalls on his computer because he could "[g]o to jail" for the things that were on it. In 2010, Tony learned from Mr. Doe that appellant had molested Jane and spoke with a police officer who was investigating the case.

San Francisco Police Inspector Alexis Goldner testified that she had investigated this case and obtained a search warrant for appellant's home because she believed she would likely find child pornography on his computers. Goldner executed the search warrant on October 19, 2010, at appellant's residence in San Francisco. Officers seized a laptop computer, a desktop computer, two thumb drives, and a floppy disk. During a forensic examination of appellant's computers and related equipment, officers found over 900 pornographic images of young, underage girls from a site called Ukraine Angels on appellant's hard drive. The girls appeared to be under the age of 12, and were in provocative poses, with some lying

6

down, some leaning over, and some with their buttocks in the air. [FN 2]

> FN 2: The parties stipulated that Dr. Tonya Chaffee, a board-certified pediatrician and adolescent medicine doctor who was the medical director of CASARC and a professor at the University of California, San Francisco, had examined the photographs and concluded that the girls depicted in them were between the ages of six and twelve.

Gloria Samayou, a licensed clinical social worker, testified that she worked for the San Francisco District Attorney's office, but was stationed at the Child Adolescent Support Advocacy Resource Center (CASARC) at San Francisco General Hospital. CASARC is comprised of a forensic team that works with children who have experienced trauma. The team provides medical examinations, forensic interviews, and therapy. Samayou, who was the multidisciplinary interview coordinator at CASARC, interviewed Jane Doe on October 15, 2010. The videotaped interview was shown to the jury.

At the time of the interview, Jane was six years old and in the first grade. She said that she and her Uncle Al did "tickle fights." He sometimes tickled her in "okay" spots, but sometimes tickled her in "the not okay spots," such as the bottom of her foot, her armpit, her knees, or her stomach. Appellant and Jane also played Monopoly and read Dr. Seuss books together.

After some hesitation, Jane told Samayou that appellant sometimes tickled her in a spot she did not like. She was not sure if she should say what spot she was talking about. Jane felt "shy" about it, but agreed to write it down. Jane then said that appellant tickled her "in the private part and I don't like it there." She explained that appellant tickled her private parts, where she goes to the bathroom, with his finger. He sometimes tickled her over clothes and "the clothes wiggle because we're moving so much." Jane pointed to the vagina in a picture of a girl doll and said that was where appellant tickled her.

Appellant sometimes tickled Jane under her clothes by unsnapping her pants and putting his finger under her underwear. He would then tickle her in the middle of her vagina, "[s]ort of, just a little bit" inside. It did not feel good when he did this; it felt "weird" and hurt a little bit. This happened "[a] lot more" than once. He would tickle her vagina when they were alone in her room. He did it every time they saw each other, including the last time she saw him. She would be lying on her bed and he would be standing or kneeling when he tickled her. Appellant also touched Jane at the ranch while they were alone, watching movies on a laptop. He started touching her vagina when she was about four.

Jane never said anything to appellant when he touched her vagina because she did not want to hurt his feelings. She explained, "he's my uncle and I still like him even when he does that." Jane told her parents about what he had done because she "thought maybe they would tell Uncle Al to stop."

Susan Houser, a pediatric nurse practitioner who worked at CASARC, testified about a forensic examination she performed on Jane Doe on October 20, 2010. Jane had a small notch to her hymen, which was a normal finding in both children who had been sexually abused and those who had not. Hence, it could neither confirm nor negate sexual abuse. Houser understood that the last incident of vaginal touching had occurred two weeks

7

before the examination. Digital penetration can cause minor scratch marks and even some tearing to the hymenal tissues. The tissue, however, heals very quickly and scarring is uncommon.

Psychologist Anthony Urquiza, a professor and the director of a child abuse treatment program in the Department of Pediatrics at the University of California at Davis Medical Center, testified as an expert in child abuse accommodation syndrome. Dr. Urquiza testified that there are many misperceptions about child sexual abuse, and described child sexual abuse accommodation syndrome, which explains some of the common behaviors and experiences of children who have been sexually abused. He also explained the five components of child sexual abuse accommodation syndrome, which include secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation.

**Defense Case**

Mrs. Doe identified various photographs and described the layout of the ranch in Sonoma.

*People v. Asturias*, No. A137391, 2015 WL 2148710, at *1-6 (Cal. Ct. App. May 7, 2015).

## III. DISCUSSION

### A. Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. The California Court of Appeal, in its opinion on direct review, addressed the two claims petitioner raises in the instant petition. The court of appeal thus was the highest state court to have reviewed petitioner's claims in a reasoned decision, and it is the court of appeal's decision that this Court reviews herein. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

**B.     Petitioner's Claims**

Petitioner asserts the following grounds for relief: (1) the trial court violated his constitutional right to a public trial when it closed the courtroom during the testimony of Jane Doe's parents; and (2) California Penal Code section 859.1, pursuant to which the trial court closed the courtroom, is unconstitutional. The Court addresses these claims in turn.

9

### 1. Public Trial

Petitioner claims he was denied his right to a public trial under the Sixth and Fourteenth Amendments when the trial judge ordered the courtroom closed to the public during the testimony of Jane Doe's parents. Petition at 5, 7-11.

The Sixth Amendment directs, in relevant part, that "'[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'" *Presley v. Georgia*, 558 U.S. 209, 212 (2010) (alteration in original). This provision is applicable to the states via the Due Process Clause of the Fourteenth Amendment. *Id.* at 211-12. The Sixth Amendment right to a public trial is the right of the accused. *Id.* The right was created for the benefit of defendants; it discourages perjury and ensures that judges, lawyers and witnesses carry out their respective functions responsibly. *See Waller v. Georgia*, 467 U.S. 39, 46 (1984); *In re Oliver*, 333 U.S. 257, 270 & n.25 (1948).

The right is not absolute, however, and "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45. In determining if the public can be excluded at any stage of a criminal trial, courts must apply the following standards:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48. *See also United States v. Sherlock*, 962 F.2d 1349, 1356 (9th Cir. 1989) (*Waller* requires that, before a court excludes the public from any stage of a criminal proceeding, the court must (1) provide the defendant with opportunity to be heard, (2) make factual findings to support closure and (3) consider reasonable alternatives to closing courtroom). When a court closes a trial to the public, it also must articulate the particular interest that would be prejudiced if the court were not closed along with findings such that a reviewing court can evaluate the propriety of the closure. *See Presley*, 558 U.S. at 215.

The California Court of Appeal summarized and rejected petitioner's claim as follows:

**Alleged Constitutional Violation of Appellant's Right to a Public Trial**

10

Appellant contends that, regardless of the propriety of the courtroom closure under [Californa Penal Code] section 859.1, the trial court violated his Sixth Amendment and state constitutional rights to a public trial when it closed the courtroom during the testimony of Jane Doe's parents. [FN 15]

> FN 15: To the extent respondent's forfeiture argument (see part I., B., 2., *ante*) includes appellant's failure to challenge the constitutionality of the statute as it was applied to him, we believe that defense counsel's objection to closure of the courtroom during the testimony of Mr. and Mrs. Doe was sufficient to preserve the issue for appeal. First, the prosecutor had based her closure motion on both section 859.1 and the *Waller* factors. Second, during argument on the motion, defense counsel referred to both "the statute and the case law," and observed that "the court needs an abundance of factors to close the courtroom." Although he did not expressly mention the federal or state Constitution, counsel's reference to the case law and the need to consider various factors was adequate to preserve the issue, especially given the constitutional interests necessarily implicated by any courtroom closure.

As previously discussed, under the Sixth Amendment, four factors must be satisfied before the trial court may close a courtroom to the public during any stage of a criminal trial: "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." (*Waller, supra*, 467 U.S. at p. 48; accord, *Woodward, supra*, 4 Cal.4th at p. 383.)

### *a. An Overriding Interest that Is Likely to Be Prejudiced*

Regarding the requirement of advancing an overriding interest that is likely to be prejudiced, appellant essentially repeats two of his earlier arguments, both of which we have already addressed, in claiming that any interest Jane had in anonymity was not compelling enough to override the " 'presumption of openness.' " (*Waller, supra*, 467 U.S. at p. 45, quoting *Press–Enterprise Co., supra*, 464 U.S. at p. 510.) He first asserts that no overriding interest was shown because the court did not hear any evidence or make any findings that disclosure of Jane's parents' testimony would damage her reputation. As previously discussed (see part I., B., 3., a., *ante*), defense counsel agreed at the outset that Jane's right to privacy constituted an overriding interest justifying closure of the courtroom. There was thus no need for additional evidence or findings on this point.

Appellant next asserts that closing the courtroom during Jane's parents' testimony would not further Jane's privacy interests with respect to the sexual abuse given that her anonymity had already been compromised earlier in the trial through the use of her parents' full names in court. Again, as we previously explained (see part I., B., 3., b., *ante*), the closure order was narrowly aimed at legal professionals at the Hall of Justice who might observe Mr. or Mrs. Doe on the witness stand, be drawn into the courtroom, and hear them describe the details of the molestation, which would both invade Jane's privacy and cause additional distress to her family.[3] Hence, Jane's overriding interest in

---

[3] The court of appeal was referring to its earlier analysis of petitioner's claim on appeal that the

11

protection of her privacy remained unaffected by the prosecutor's use of her parents' names.

The Supreme Court has emphasized that a state's interest in "safeguarding the physical and psychological well-being of a minor is a compelling one." (*Globe Newspaper Co., supra*, 457 U.S. at pp. 607–608.) We conclude that the first *Waller* requirement of advancing "an overriding interest that is likely to be prejudiced" was satisfied in this case. (See *Waller, supra*, 467 U.S. at p. 48.) [FN 16]

> FN 16: We also observe that the California Constitution affords special protections to victims of crime. Proposition 9, the "Victims' Bill of Rights Act of 2008: Marsy's Law," amended the California Constitution to guarantee crime victims certain rights, including the right "[t]o be treated with fairness and respect for his or her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process." (Cal. Const., art. I, § 28, subd. (b)(1).) Marsy's Law further provides that "[a] victim, the retained attorney of a victim, a lawful representative of the victim, or the prosecuting attorney upon request of the victim, may enforce the rights enumerated in subdivision (b) in any trial or appellate court with jurisdiction over the case as a matter of right. The court shall act promptly on such a request." (Cal. Const., art. I, § 28, subd. (c)(1).)

### *b. The Closure Should Be No Broader than Necessary to Protect the Overriding Interest*

Appellant argues that the trial court made no effort to ensure that the closure was no broader than needed to protect Jane's anonymity.

As previously discussed (see part I., B., 3., a., *ante*), using the framework of section 859.1, the trial court determined that, in order to protect Jane's privacy and reputation, it was necessary to close the courtroom during the testimony of her parents. As the court explained, Mr. and Mrs. Does' testimony about the sexual abuse would be "almost the same thing" as Jane testifying about it. In examining the breadth of the closure, it must be noted that the court did not close the courtroom to the public during the entire trial. (Compare *Waller, supra*, 467 U.S. at pp. 48–49 [trial court's blanket closure of entire seven-day suppression hearing without considering specific need for privacy was overbroad].) Nor did it even close the courtroom during all testimony "relating to" Jane Doe since, unlike with the testimony of Jane's parents, this other testimony would neither draw the Hall of Justice community into the courtroom nor reveal Jane's identity. (§ 859.1, subd. (a).) Social worker Gloria Samayou testified about the interview she conducted with Jane, in which Jane had described the sexual abuse. Pediatric nurse

---

trial court had failed to comply with the procedural requirements of California Penal Code section 859.1. Specifically, the court of appeal noted that the prosecution's motion to close the courtroom was based on the fact that Mr. and Mrs. Doe were extremely well-known members of the San Francisco criminal defense bar. The trial court found that, given the culture of the Hall of Justice, any lawyer who might see a defense lawyer on the stand would be compelled to stay, which would attract attention. The court of appeal agreed that such an occurrence "would eliminate Jane's anonymity amongst the community of people with whom Jane's parents would have to continue to interact . . . ." *People v. Asturias*, 2015 WL 2148710, at *12-15. This ruling was not undercut by the prior mention of Jane's parents' names in court, "where there was no danger that members of the legal community in question would observe them on the witness stand. . . ." *Id.* at *15.

practitioner Susan Houser testified about the results of the forensic examination she performed on Jane. In addition, when Mrs. Doe briefly testified again during the defense case, primarily identifying photographs and describing the layout of the ranch in Sonoma, it appears that the courtroom remained open. Beyond Jane's testimony itself, the closure was limited to her parents' testimony during the prosecution case only. This was based on the court's reasonable finding that such a closure was necessary to protect Jane's privacy with respect to her parents' Hall of Justice peers, in light of their detailed testimony recounting Jane's disclosure of the sexual abuse, which included explicit descriptions of the nature of that abuse. (See part I., B., 3., b., *ante*; cf. *United States v. Yazzie* (9th Cir.2014) 743 F.3d 1278, 1289 [courtroom closure was narrowly tailored to asserted interest because courtroom was closed only during testimony of child victims].)

Moreover, even during the testimony in question, no one connected to the case was excluded; all courtroom personnel, as well as attorneys, assistants, and interns for the parties and, of course the jury, were present. Also, there is no indication that any portion of the trial, including the testimony in question, was not reported, and the transcripts are available for public review. Finally, although the prosecutor had stated in her motion to close the courtroom and at the hearing on that motion that she would not object to a support person for appellant being in the courtroom during the parents' testimony, neither appellant nor his counsel expressed his desire for the presence of a support person.

It is also important to note that section 859.1 itself implicitly requires the court to weigh the competing interests in determining whether protection of a minor victim's reputation requires a temporary closure of the courtroom during either the testimony of the minor or testimony relating to that minor. Hence, the statute itself permits a closure that is no broader than necessary to protect the minor victim's reputational interest. (See *Waller, supra*, 467 U.S. at p. 48.) Rather than making a blanket closure order based on the state's compelling interest in "safeguarding [Jane's] physical and psychological well-being," the court in this case considered the particular circumstances of the case, weighing various factors, including, inter alia, "the desires of the victim" and the "interests of parents," before making its temporary closure order. (*Globe Newspaper Co., supra*, 457 U.S. at pp. 607-608, fn. omitted.) The court thereby balanced appellant's and Jane's competing interests to allow a form of closure no broader than necessary in the circumstances. (See *Waller*, at p. 48; accord, *Woodward, supra*, 4 Cal.4th at p. 383.)

*c. Consideration of Reasonable Alternatives to Closing the Proceeding*

Appellant claims the trial court failed to consider any reasonable alternatives to closing the courtroom during Mr. and Mrs. Does' testimony.

First, section 859.1 itself addresses the requirement that the court consider reasonable alternatives to closing the courtroom by permitting only a temporary closure of the courtroom during certain specified testimony by or relating to minor victim, and only when absolutely necessary to protect the minor's reputation. Here, the court considered the alternative of closing the courtroom during Jane's testimony only, but, after examining the relevant factors in section 859.1 and considering the specific circumstances, reasonably determined that closure during the parents' testimony was also necessary to protect Jane's reputation. (Compare *Waller, supra*, 467 U.S. at pp. 48-49 [court should have considered alternatives to closure of entire suppression hearing, such as obtaining more detailed

information from the prosecution about the need for closure, and then "closing only those parts of the hearing that jeopardized the interests advanced"].)

Appellant nevertheless asserts that the court should have considered several additional alternatives to temporarily closing the courtroom during the testimony of Jane's parents. For example, according to appellant, the court should have asked the prosecutor to provide more information about its need for closure or questioned Jane, her therapist, or her parents. As already discussed (see part I., B., 3., a., *ante*), the court had sufficient information about Jane's situation and the importance of the interest at stake. Appellant also asserts that the court should have considered "beginning Jane Doe's parents' testimony, and then calling a recess to discuss how to proceed if the 'sizable crowd' the court feared materialized—or even if a single legal professional known to Jane Doe's parents happened to enter the courtroom. The judge could have allowed Jane Doe's parents to communicate with her via a signal of some sort if legal professionals they were acquainted with entered the courtroom. The judge could have taken other steps, as well, for example, ordering the court reporter and bailiff not to discuss the matter with other courthouse employees or legal professionals, which would have reduced the risk that gossip would draw legal professionals acquainted with Jane Doe's parents to the courtroom." Appellant also suggests that the court could have placed a sign on the door or stationed a bailiff outside the courtroom to exclude "all legal professionals not directly connected to the case." The requirement, however, is that the court consider "reasonable" alternatives to closing the courtroom. These suggestions by appellant involve unwieldy methods that would have only served to distract both the jury and the witnesses from the testimony at hand and/or would have likely been ineffective in providing the protection the court deemed necessary.

We conclude the trial court considered reasonable alternatives to closing the courtroom during the testimony of Jane's parents. (See *Waller, supra*, 467 U.S. at p. 48.)

### *d. Court Must Make Findings Adequate to Support the Closure*

In asserting that the trial court did not make findings adequate to support the closure, appellant primarily repeats arguments about the propriety of closing the courtroom generally, which we have already addressed elsewhere in this opinion. [FN 17] We believe the court's findings, in which it explained the basis of its ruling that closure was necessary, were adequate to support its decision. Unlike *Baldwin*, in which the trial court made only the conclusory finding that, "when a child under the age ... of 16 is testifying about such matters, the courtroom may be closed upon their request " (*Baldwin, supra*, 142 Cal.App.4th at p. 1420), the record here reflects that the trial court "balanced the competing interests and fashioned an order narrowly tailored to infringe on the competing interests as little as possible." (*Id.* at p. 1243.)

> FN 17: For example, appellant argues that the court should have questioned Jane's parents about their wishes, should have questioned Jane or her therapist about whether the potential damage to her reputation would traumatize her, and "made no finding that disclosure of Jane Doe's identity would harm her reputation; rather it seemed to assume that it would." As to the last point, we again note that appellant not only failed to object to closing the courtroom during Jane's testimony, defense counsel acknowledged that Jane's privacy rights were "absolutely overriding."

14

> In sum, because the trial court's ruling complied with the factors set forth in *Waller*, we conclude the closure of the courtroom during the testimony of Jane Doe's parents did not violate appellant's Sixth Amendment right to a public trial. (See *Waller, supra*, 467 U.S. at p. 48; *Woodward, supra*, 4 Cal.4th at p. 383.)

*People v. Asturias*, 2015 WL 2148710, at *15-19.

Applying the legal principles outlined above on the Sixth Amendment right to a public trial to petitioner's current allegations, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent and was not based on an unreasonable determination of the facts in light of the entire trial record. The court of appeal reasonably concluded that the prosecution adequately demonstrated a compelling interest in protecting the identity of the victim from the embarrassment and trauma associated with relating the details of the sexual assaults and molestation by a family member. The closure of the courtroom was minimal and tailored to serve that interest. The victim's mother's testimony was on day one between 10:30 and 1:55 and included a lunch break. CT at 439-40. The victim's father testified on day two between 9:35 and 11:38. CT at 446-47. Court personnel, the attorneys, petitioner, the court reporter and, of course, the jury, comprised of members of the public, were present. Moreover, the entire proceeding was reported, the transcripts of the proceeding are available to the public, and there is no claim that anything transpired which is not reflected in the transcript. *Cf. Ayala v. Speckard*, 131 F.3d 62, 72 (2nd Cir. 1997) (noting that availability of transcript of proceedings as a consideration in deciding whether a limited closure designed to protect single witness was violative of the Sixth Amendment right to public trial). Finally, the trial judge considered the alternative of closing the courtroom during Jane's testimony only and ultimately made findings to support the additional closure during Jane's parents' testimony. RT at 198-200.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**2.     California Penal Code § 859.1**

Petitioner claims that California Penal Code section 859.1 is unconstitutional on its face. Petition at 5. He specifically claims that factor five (5), which asks the trial court to determine "[w]hether there is an overriding public interest in having an open hearing"—as opposed to an

15

overriding interest in having a closed hearing—shifts the burden of proof to the party opposing closure. Petition at 12-13. He also argues that the statute permits closure without consideration of all the *Waller* factors. *Id.* Respondent argues that the claim should be dismissed as procedurally defaulted given the California Court of Appeal's finding that petitioner failed to raise the claim at trial. The court of appeal reasoned as follows:

> Appellant first contends section 859.1 is unconstitutional on its face because it does not require the trial court to adhere to the factors described in *Waller*. According to appellant, the statute improperly "permits closure without requiring that the trial court consider reasonable alternatives to closing the courtroom, that the closure be no broader than necessary to protect an overriding interest that is likely to be prejudiced by a public proceeding, and that the trial court make findings adequate to support the closure. [Citations.]" Respondent counters that appellant has forfeited the claim that section 859.1 is unconstitutional by failing to object on that ground in the trial court.
>
> "[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights. [Citations.]" (*In re Seaton* (2004) 34 Cal.4th 193, 198; accord, *People v. Romero* (2008) 44 Cal.4th 386, 411.)
>
> Here, in light of appellant's failure to raise any facial constitutional challenge to section 859.1 in the trial court, we decline to address the issue on appeal. The failure to even hint at such an objection deprived the trial court of the opportunity to address it before making its ruling. (See, e.g., *People v. Romero, supra*, 44 Cal.4th at p. 411 [reason for forfeiture "rule is to allow errors to be corrected by the trial court and to prevent gamesmanship by the defense"].) [FN 7]
>
>> FN 7: At oral argument, counsel for appellant argued, in particular, that subdivision (b)(5) of section 859.1—which provides that the court must consider "[w]hether there is an overriding public interest in having an open hearing"—unconstitutionally shifts the burden to the defendant to demonstrate an overriding interest in an open courtroom, in violation of the first *Waller* factor, which requires the proponent of the closure to "advance an overriding interest that is likely to be prejudiced." (*Waller, supra*, 467 U.S. at p. 48.) However, in light of defense counsel's failure to object on this ground in the trial court, we will not address this or any other argument regarding the facial constitutionality of section 859.1. (See *People v. Romero, supra*, 44 Cal.4th at p. 411.)

*People v. Asturias*, 2015 WL 2148710, at *10-11.

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). In cases in

16

which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred. *See id.* at 750. The rule cited here by the court of appeal, specifically, that a defendant must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default. *See Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim procedurally defaulted based on California's contemporaneous objection rules). The claim is therefore procedurally defaulted.[4]

Further, even accepting petitioner's argument that Section 859.1 is somehow unconstitutional, its application to petitioner's case was harmless. The issue before this Court on federal habeas is whether petitioner's federal constitutional rights were violated. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("Federal habeas corpus relief does not lie for errors of state law."). As discussed above, after applying the *Waller* factors, it cannot be said that petitioner was denied his Sixth Amendment to a public trial. Consequently, even assuming the trial court erred in proceeding under a Section 859.1 analysis, petitioner cannot show the error had "substantial and injurious effect" on the verdict. *See Brecht*, 507 U.S. at 637. Specifically, even if the state court had proceeded only under the Sixth Amendment in deciding whether it was appropriate to close the courtroom during the testimony of Jane's parents, the end result would have been the same.

Accordingly, petitioner is not entitled to habeas relief on this claim.

**C.     Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

---

[4] Although a petitioner may avoid procedural default by showing cause for the default and actual prejudice as a result of the alleged violation of federal law, or by showing the failure to consider the claims will result in a fundamental miscarriage of justice, *see Coleman* 501 U.S. at 750, petitioner here has made no such showing or even an effort to do so.

17

certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: 12/29/2017

HAYWOOD S. GILLIAM, JR.
United States District Judge

18